Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESUS MENDOZA, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> HF FOODS GROUP INC., ZHOU MIN NI, XIAO MOU ZHANG, CAIXUAN XU, and JIAN MING NI, <br><br> Defendants. | No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>CLASS ACTION</u> <br><br> JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Plaintiff Jesus Mendoza ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, public filings, wire and press releases published by and regarding HF Foods Group Inc. ("HF Foods", "HF" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded HF Foods securities between August 23, 2018 and March 23, 2020, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this judicial district

1

so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

5.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered, the subsequent damages took place in, and the Company maintains locations in this judicial district.

6.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

7.     Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

8.     Defendant HF Foods through its subsidiaries, purports to market and distribute fresh produce, frozen and dry food products, and non-food products to Asian restaurants, primarily Chinese restaurants, and other foodservice customers throughout the Southeast, Pacific, and Mountain West regions in the United States.

9.     The Company is incorporated in Delaware and its head office is located at 6001 W. Market Street, Greensboro, NC. HF Foods' securities trade on the NASDAQ exchange under the ticker symbol "HFFG."

10.    Defendant Zhou Min Ni has served as the Company's Co-Chief Executive Officer ("Co-CEO") and Chairman during the Class Period.

2

11.     Defendant Xiao Mou Zhang ("Zhang") has served as the Company's Co-CEO, Chief Financial Officer ("CFO"), as a Director and also as the CEO and Secretary of B&R Global Holdings, Inc. ("B&R") during the Class Period.

12.     Defendant Jian Ming (Jonathan) Ni ("Jonathan Ni") served as the Company's CFO and Principal Accounting Officer during the Class Period until April 2019.

13.     Defendant Caixuan Xu ("Xu") served as the Company's CFO and Principal Accounting Officer from April 2019 to November 2019, and as the Company's Vice President of Finance after November 2019.

14.     Defendants Zhou Min Ni, Zhang, Jonathan Ni, and Xu are collectively referred to herein as the "Individual Defendants."

15.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

3

16.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

17.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

18.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading
### Statements Issued During the Class Period

19.     On August 23, 2018, HF Foods issued a press release announcing Atlantic Acquisition Corp. ("Atlantic") (then the Company's name) recent "consummation of its business combination with privately-held HF Group Holding Corporation ("HF Group"); its name change to "HF Foods Group Inc."; and the change in ticker symbol from "ATACU", "ATAC", and "ATACR" to "HFFG". Further, the press release announced the following: "As a result of the completion of the business combination, the former shareholders of HF Group will be issued 19.97 million shares of stock (representing approximately 88.5% of the outstanding common stock) at a value of $10.00 each, based on a $199.7M valuation of the combined company."

20.     On August 27, 2018, HF Foods filed with the SEC a Form 8-K, signed by Defendant Jonathan Ni, which described the merger of HF Group and Atlantic, in part as:

Pursuant to the Merger Agreement, HF Group merged with HF Merger Sub and HF Group became the surviving entity (the

4

"Merger") and a wholly-owned subsidiary of Atlantic (the "Acquisition"). Additionally, upon the closing of the transactions contemplated by the Merger Agreement (the "Closing"), (i) the stockholders of HF Group became the holders of a majority of the shares of common stock of Atlantic, and (ii) Atlantic changed its name to HF Foods Group Inc. (collectively, these transactions are sometimes referred to as the "Transactions").

\*    \*    \*

At closing on August 22, 2018, Atlantic issued the HF Group stockholders an aggregate of 19,969,831 shares of its common stock, equal to approximately 88.5% of the aggregate issued and outstanding shares of Atlantic's common stock. The pre-Transaction stockholders of Atlantic own the remaining 11.5% of the issued and outstanding shares of common stock of the combined entities.

\*    \*    \*

After giving effect to the Transactions, there are currently 22,558,492 shares of Atlantic's common stock issued and outstanding (without giving effect to the post closing cancellation of 390,000 shares held by an unaffiliated stockholder as described on page 4 of this Report on Form 8-K). Upon the Closing, Atlantic's rights and units ceased trading and Atlantic's common stock commenced trading on Thursday, August 23, 2018 on the Nasdaq Capital Market under the symbol "HFFG".

21.    On September 13, 2018, HF Foods filed with the SEC a Form 8-K which provided the following information, in pertinent part, about Zhou Min Ni's employment with HF Foods:

The Company's agreement with Mr. Zhou Min Ni provides that he will serve as Chief Executive Officer of the Company and its subsidiaries. The agreement has a term which expires August 31, 2023. The agreement provides for automatic extensions of additional one-year terms unless either party provides written notice of termination at least 90 days prior to the termination date. *Mr. Ni's base salary is $400,000 per year* and he is eligible for bonus awards

5

based upon criteria which may be set from time to time by the Compensation Committee of the Board of the Company. He is eligible to receive benefits such as health care and related benefits as provided to other senior officers of the Company. There are no equity awards under the agreement.

(Emphasis added.)

22.     On November 11, 2018, HF Foods filed with the SEC its quarterly report for the period ended September 30, 2018 (the "3Q 2018 Report"), signed by Defendants Zhou Min Ni and Jonathan Ni. Attached to the 3Q 2018 Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Zhou Min Ni and Jonathan Ni attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. The 3Q 2018 Report also purported to provide all related party transactions.

23.     On April 1, 2019, HF Foods filed with the SEC its annual report for the period December 31, 2018 (the "2018 Annual Report"), signed by Defendants Zhou Min Ni and Jonathan Ni. Attached to the 2018 Annual Report were certifications pursuant to SOX signed by Defendants Zhou Min Ni and Jonathan Ni attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

24.     The 2018 Annual Report purported to provide all related party transactions. The 2018 Annual Report also stated the following regarding its gross margin decrease and related party transactions:

Gross margin for our wholesale segment decreased by $440,000, or 32.1%, and our wholesale revenue decreased by $1.2 million or 6.2%. The decrease in margins resulted form increased sales to related parties relative to total wholesale revenue in 2018 as

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

compared to 2017. The wholesale price for related parties is generally lower than third party customers due to the larger quantities purchased by related parties resulting in lower margin than the sales made to third parties. For the year ended December 31, 2018, 96.3% of the wholesale revenue was generated by related parties, compared to 92% in 2017.

25.    On May 15, 2019, HF Foods filed with the SEC its quarterly report for the period ended March 31, 2019 (the "1Q 2019 Report"), signed by Defendants Zhou Min Ni and Xu. Attached to the 1Q 2019 Report were certifications pursuant to SOX signed by Defendants Zhou Min Ni and Xu attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. The 1Q 2019 Report also purported to provide all related party transactions.

26.    On June 25, 2019, HF Foods filed with the SEC a Form 8-K describing its merger with B&R, signed by Zhou Min Ni. The 8-K describing the merger with B&R did not state that B&R was a related party. The 8-K also stated the following regarding shares in connection with the B&R merger:

Upon the closing of the transactions contemplated in the Merger Agreement, Merger Sub will merge with and into B&R, resulting in B&R becoming a wholly owned subsidiary of HF. The former shareholders of B&R will receive 30,700,000 shares of HF common stock as consideration for the merger.

27.    On August 14, 2019, HF Foods filed with the SEC its quarterly report for the period ended June 30, 2019 (the "2Q 2019 Report"), signed by Defendants Zhou Min Ni and Xu. Attached to the 2Q 2019 Report were certifications pursuant to SOX signed by Defendants Zhou Min Ni and Xu attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. The 2Q

7

2019 Report also purported to provide all related party transactions.

28.    On March 16, 2020, HF Foods filed with the SEC its annual report for the period ended December 31, 2019 (the "2019 Annual Report"), signed by Defendants Zhou Min Ni and Zhang. Attached to the 2019 Annual Report were certifications pursuant to SOX signed by Defendants Zhou Min Ni and Zhang attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. The 2019 Annual Report purported to provide all related party transactions.

29.    The 2019 Annual Report reiterated the previously released information regarding the merger with B&R and noted the following regarding its shares: "As of March 13, 2020, the registrant had 52,145,096 shares of common stock issued and outstanding."

30.    The statements referenced in ¶¶19-29 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) HF Foods engaged in undisclosed related party transactions; (2) HF Foods insiders and related parties were enriching themselves by misusing shareholder funds; (3) HF Foods was "gaming" the FTSE/Russell Index by masking the true number of shares free floating; and (4) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

### THE TRUTH EMERGES

31.    On March 23, 2020, Hindenburg Research published a report (the "Report") explaining that HF Foods had, among other issues, failed to disclose:

8

(i) transactions with related-parties; (ii) its flagrant misuse of shareholder funds; and (iii) its gaming of the FTSE/Russell Index criteria.

32.    The Report noted the following, in pertinent part, regarding HF Foods' undisclosed related party transactions:

> ***HF's massive $509 million merger with food distributor B&R appears to be a blatant undisclosed related-party transaction.*** The company claimed that the deal was negotiated at "arm's length", but we found multiple documents showing that both HF and B&R were part of the same Chinese investment group for years prior to the acquisition.

> \*        \*        \*

> We found that the massive $509 million merger with B&R appears to be an undisclosed related-party transaction.

> \*        \*        \*

> **HF Foods' Massive $509 Million Merger with B&R Appears To Be Just One of Dozens of Suspicious Related-Party Transactions**

> Our review of HF Foods uncovered a staggering number of related-party transactions, both disclosed and undisclosed, that we believe are suspicious.

> \*        \*        \*

> ***We believe insiders are using these dozens of related-party transactions to suck cash out of the business, eventually leaving shareholders with a hollow, debt-laden company.***

> **Undisclosed Related-Party Transactions: HF Group Had Clear Ties to B&R Before Consummating its $509 Million "Arm's-Length" Deal, Yet None of It Was Disclosed to Shareholders**

> In June 2019, HF Foods announced [] it would be merging with B&R Global Holdings, a West Coast food distribution company. The merger [] was a 2-part transaction valued at a massive $509 million.

9

It included HF Foods issuing 30.7 million shares to former B&R shareholders, more than doubling the company's outstanding share count and adding [] ~$101 million in debt to the balance sheet.

According to deal documents, the acquisition process started when HF's CEO phoned B&R's CEO in October 2018. [] T*he deal documents describe the transaction as being negotiated "at arm's-length".* []

Contrary to those representations, we found longstanding formal ties between HF Foods and B&R:

- *HF and B&R were both under the umbrella of the same investment group, the American International Rongjin Investment Group,[] according to an announcement [] by the Chinese Ministry of Commerce in 2012.*[]
- In 2012, an affiliate of the above-named entity also affirmed [] that HF and B&R are part of the same investment holding group.
- *A May 2018 interview [] with the President of Fujian Rongjin Group [], Zhang Yi Tuan (张贻团) also affirmed the relationship.* According to the interview, the American International Rongjin Investment Group's distribution business operates in the U.S. and includes both HF and B&R. According to the interview, the group uses B&R as its official American headquarters and works with HF Foods and others to jointly distribute food in the U.S.

Instead of being "at arm's length", these entities look to have been closely affiliated through the same investment group for at least 8 years, which we believe clearly makes them related-parties.

*These intricate pre-existing connections represent a major conflict of interest, yet none of this was disclosed to investors prior to, or after, the merger.*

(Emphasis added.)

33.   The Report noted the following, in pertinent part, regarding HF Foods' misuse of shareholder funds:

HF has transacted with at least 43 separate related-party entities in 2019 alone. *Several are based out of the company's own headquarters and appear to have no operations.* We visited others across the country and found red flags suggesting that these related parties are being used by insiders to extract cash from the business.

We discovered that the company's trucking subsidiary, ostensibly set up to transport food products, *appears to have also used shareholder cash to purchase an undisclosed fleet of exotic supercars including Ferraris, Porsches, and a Bentley. We found photos of the Chairman's teenage son bragging on Instagram about them being his vehicles.*

*HF also directed over $2 million of shareholder cash to business entities owned by the Chairman's teenage son, including one that bought another fleet of 7 Ferraris* . . .

\*   \*   \*

In addition to undisclosed related-party transactions, the company has also *conducted dozens of irregular disclosed related-party transactions*.

In total, the company transacted with 43 related-party entities in 2019 alone. [] In 2019, HF Foods reported over $40 million in purchases and $19.3 million in sales to related-party entities. []

*Our investigation uncovers related entities with (a) minimal or no online presence, (b) no signage or apparent operations at their respective registered addresses and (c) entities held out as separate companies to investors that appear to actually be operating as part of HF.*

*We believe insiders are using these dozens of related-party transactions to suck cash out of the business*, eventually leaving shareholders with a hollow, debt-laden company.

\*   \*   \*

11

**Undisclosed Insider Enrichment: An HF Subsidiary Owns a Fleet of Ferraris and Exotic Luxury Supercars, Paid for By Shareholders.**

**The CEO's Son Bragged About Them Being His Cars on Instagram**

In another series of highly irregular transactions, we examined the assets of Truse Trucking, a company subsidiary[.] [Image omitted.]

\*     \*     \*

In addition to the fleet of trucks, however, our background check showed that Truse owns an undisclosed fleet of exotic luxury supercars, including Ferraris, a Bentley, a Porsche, and other high-end vehicles . . .

These, we presume, are not used to deliver raw and refrigerated food products to the company's customers.

For example, a 2013 Bentley Continental, with an MSRP of $193,000, the license plate "99Pr0BZ" and previous license plate "BENTOVER", is titled and registered to Truse.

We could think of no business justification for just about any public company purchasing Ferraris or Bentleys with shareholder money. *The HF Chairman/CEO's son puts these vehicles to apparent personal use, bragging openly about his "stable" of cars on his public Instagram [] account* (we expect he'll soon discover privacy settings). . . [Image omitted.]

A **Ferrari, with an MSRP of $319,995** and the license plate "WANTMY" is also registered to Truse Trucking, according to our background check. [Image omitted.]

We matched this Ferrari and the "WANTMY" license plate to the Chairman/CEO's son's Instagram account[.] [Image omitted.]

12

*In total, we found 8 luxury supercars valued at a ~$1.5 million MSRP registered to and owned by Truse Trucking[.]* [Image omitted.]

*Nowhere do we see any of these cars disclosed as compensation. The Chairman/CEO's executive salary supposedly consisted of $400,000 in cash[.]*

\*       \*       \*

**HF's Disclosed Related-Party Transactions: Wholesale Margins to These Entities Collapsed Immediately After the IPO. Cash Seems to Be Slipping Out the Back Door**

*HF reported a ~33% collapse in its wholesale gross margins in the quarter after it went public*, by related-parties that presumably benefitted from the margin compression. [Image omitted.]

*The company acknowledges that the margin decline was due to related-party sales*, but tried to explain it away by citing volume discounts[.] [Internal quotation omitted.]

This explanation is puzzling. Sales only grew ~3% year over year for the comparable 2019/2018 9-month period, so there was no surge in volume. *Furthermore, the company disclosed that related parties constituted 92% of wholesale segment sales in 2017[], making it impossible for related business to have meaningfully increased. []*

Our investigation of these related-party entities uncovers a different explanation for why the company's sudden wholesale margins have collapsed: **insiders appear to be looting the place**.

\*       \*       \*

**$4 Million Of Shareholder Cash Was Used for Purchases and Advances to Revolution Industry, An Entity Based Out of HF Foods' Headquarters, Owned 100% By The Chairman/CEO's Son, That Was Formed 1 Month Prior to the IPO Deal, With No Visible Signs of an Actual Business**

13

HF Foods discloses transacting ~$3.3 million in purchases from, and directing over $700 thousand in advances to Revolution Industry. [] Revolution Industry is 100% owned by the Chairman/CEO's son and claims to do business in "food processing" and "distribution" according to its North Carolina corporate [] filings.

***We find it suspicious that HF Foods directed ~$4 million in business to the Chairman's son, who was likely a senior in high school at the time***, according to social media posts.

\*     \*     \*

***We found no signs that Revolution Industry is an actual business—no website, no social media profile, and no evidence of it having customers.***

Even more suspicious, North Carolina corporate records [] show that **the entity is registered to the same address as [] HF Foods' headquarters**: 6001 West Market Street, Greensboro North Carolina[.]

\*     \*     \*

What kind of food could HF be distributing to an entity based out of its own address? We think the only thing being distributed is money to insiders.

**$483,000 in Loans to Revolution Automotive, Another Related-Party Entity Owned 100% by the Chairman/CEO's Son to Buy Yet More Ferraris**

\*     \*     \*

HF Foods also extended $483,000 in loans to the similarly named "Revolution Automotive" (not to be confused with the above-mentioned "Revolution Industries"). These loans were distributed around the time of the March 2018 take-public deal announcement. []

***Revolution Automotive is also 100% owned by the Chairman/CEO's son, according to HF Foods' filings [], and is***

14

*also registered to the address of HF Foods' headquarters, according to the North Carolina Secretary of State []. Once again, we couldn't find any business operations by "Revolution Automotive".* [Image omitted.]

The only discernible assets held by Revolution Automotive are titles to 9 Ferraris, according to our background check[.]

*       *       *

As to the loan balance owed to shareholders, the Chairman/CEO recently paid it off personally with shares of illiquid HF stock. [] This, in our view, allowed him to draw cash out of the business in exchange for nearly worthless paper.

**Over $1 Million Of Shareholder Cash Has Gone to UGO USA Inc., Another Related-Party Entity Registered to HF Foods' Headquarters with Few Signs of Operations**

HF Foods has made almost $1 million of purchases over the past 2 years from UGO USA, Inc, another related-party entity based out of HF's headquarters. According to company filings, HF's Chairman/CEO owns a 30% equity interest in UGO.

We found little evidence that UGO is an actual operating business, though it appears it had taken steps to become one in the past. In 2016, the entity filed a trademark application [] for "on-line retail store services featuring Asian snacks, Asian beauty products, Asian health supplements, Asian home appliances, and Asian restaurant supplies." We were unable to locate any online store or online presence.

**$11.6+ Million of Shareholder Cash Went to Eastern Fresh, An Entity HF Foods Claims is a Separate Business. Signage at the Facility Has HF's Logo, Indicating Otherwise**

Since 2017, HF has directed $11.6 million into Eastern Fresh LLC, a company that HF's Chairman/CEO owns a 30% equity interest in. [] Eastern Fresh appears to be registered as "Eastern Fresh NJ LLC []", a distributor based in New Jersey.

15

Despite HF filings claiming that Eastern Fresh is not a subsidiary (but rather a separate related-party), its signage appears to bear the logo of HF's customer-facing subsidiary [], Han Feng, Inc.

\*      \*      \*

Again, HF appears to be presenting a unified face to customers, while separating these entities from investors. This is consistent with what we would expect if these entities are being used to funnel out shareholder cash.

**$1.8 Million in Shareholder Cash Went to Related-Party Fortune One Foods. Once Again, HF Foods' Filings Describe it as a Separate Entity. But Fortune One Describes Itself as Being a Part of HF Foods**

HF's Chairman/CEO indirectly owns a 17.5% equity interest in Fortune One Foods Inc. [] HF has made about $1.8 million in purchases from the entity, according to company filings. [] Although filings claim that Fortune One is not an HF subsidiary, but instead a separate related-party entity, Fortune One appears to brand itself as if it were part of HF.

\*      \*      \*

We also called the number listed on its Facebook page [] and asked a representative point blank if it was an independent business or if it was part of Han Feng. His reply (which we have recorded) was: "Yeah we are a part of Han Feng." . . .

All told, we find it alarming that Fortune One describes itself as being a part of HF Foods, whereas HF Foods does not include it as a subsidiary []. Instead, it reports it as a separate related-party entity, allowing insiders to personally profit from transactions with it.

**NC Noodle, A Related-Party Owned By HF's Previous CFO, Made ~$4.2 Million In Sales To HF, But Our On-The-Ground Research Showed Its Premises To Be Largely Vacant**

16

HF states that the company's recently departed CFO owns a 66% equity interest in NC Noodle. [] Based on HF's disclosures, we estimate that NC Noodle sold ~$4.2 million to HF in 2019 alone, yet we found no customer-facing business presence online.

\*    \*    \*

We suspect this is little more than an insider-owned entity that sells product to nearby HF. We have serious doubts about whether this "middle man" provides value to anyone but HF insiders.

**HF's Chairman Has Effectively Sold Almost 10% Of His Shares by Purchasing ~$12 Million in Loans Made by HF And Paying Them Back With His Own Illiquid Stock**

In another series of incestuous and alarming related-party transactions, HF's Chairman/CEO bought cash loans issued by HF to related and nonrelated parties and **paid these loans back using shares of his illiquid HF stock**.

The Chairman/CEO's transactions include purchasing loans originated by HF Foods to his son's "business", Revolution Automotive, along with other related parties.

(Emphasis added.)

34.    The Report noted the following, in pertinent part, regarding HF Foods' gaming of the FTSE/Russell Index criteria:

The B&R merger more than doubled HF's share count. However, FTSE/Russell mistakenly included almost all of these shares as part of the company's free float, which sent HFFG's price and volume soaring on Friday's index rebalancing. We think this mistake may be reversed.

***We believe HF and its insiders are masking the true number of shares held by its affiliates.*** Once made clear to FTSE/Russell, we expect the recent forced index buying in HF will reverse and become forced selling.

17

*     *     *

FTSE/Russell had calculated HFFG's free float to be 21.8 million shares (per its subscription-only service). **This calculation was just flat out wrong**. The freely tradable shares were **6.2 million** per HF's own recent March filing. []

The source of the mistake appears to have been the accidental addition of shares from the B&R transaction, which closed in November []. As with every such merger, shares issued to the acquirees are restricted for at least 6 months, according to SEC Rule 144 []. FTSE/Russell apparently missed this and added the shares to its free float calculation anyway. We think FTSE/Russell should reverse this decision, which would lead to a forced selling of the shares purchased.

Beyond the above, which appears to largely be a FTSE/Russell error, sometimes *companies are able to juke the index rebalancing process to ensure that the actual free float [] is tighter than it appears. We think this may also be taking place.*

For example, as shown earlier, *to the extent that shares are held by family members or affiliates (potentially through dozens of related-party entities), this can serve to constrain the true free float. Given the sheer consistency of the index rebalancing irregularities around HF (and Wins, backed by the same sponsor), we believe this to be likely.* To the extent Russell takes action, forced sales by passive investors could add severe selling pressure to HF's shares.

(Emphasis added.)

35.     On this news, shares of HF Foods' fell $2.52 per share, or over 20%, to close at $9.80 per share on March 23, 2020, damaging investors.

36.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

18

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired HF Foods securities publicly traded on NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of HF Foods and its subsidiaries, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

38.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, HF Foods securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

39.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

40.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

41.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

•       whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of HF Foods;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused HF Foods to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of HF Foods securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

42. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

43. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- HF Foods shares met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;

- As a public issuer, HF Foods filed periodic public reports;

- HF Foods regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- HF Foods's securities were liquid and traded with sufficient volume during the Class Period; and

- HF Foods was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

44.     Based on the foregoing, the market for HF Foods securities promptly digested current information regarding HF Foods from all publicly available sources and reflected such information in the prices of the securities, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

45.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

## COUNT I

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

46.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

47.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

48.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

49.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of HF Foods securities during the Class Period.

50.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of HF Foods were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of HF Foods, their control over, and/or receipt and/or modification of HF Foods's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning HF Foods, participated in the fraudulent scheme alleged herein.

51.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other HF Foods personnel to members of the investing public, including Plaintiff and the Class.

52.    As a result of the foregoing, the market price of HF Foods securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of HF Foods securities during the Class Period in purchasing HF Foods securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

53.    Had Plaintiff and the other members of the Class been aware that the market price of HF Foods securities had been artificially and falsely inflated by

23

Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased HF Foods securities at the artificially inflated prices that they did, or at all.

54.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

55.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of HF Foods securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

56.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

57.     During the Class Period, the Individual Defendants participated in the operation and management of HF Foods, and conducted and participated, directly and indirectly, in the conduct of HF Foods's business affairs. Because of their senior positions, they knew the adverse non-public information about HF Foods's misstatement of revenue and profit and false financial statements.

58.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to HF Foods's financial condition and results of operations, and to correct promptly any public statements issued by HF Foods which had become materially false or misleading.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

59.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which HF Foods disseminated in the marketplace during the Class Period concerning HF Foods's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause HF Foods to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of HF Foods within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of HF Foods securities.

60.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by HF Foods.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: March 29, 2020            **THE ROSEN LAW FIRM, P.A.**

<u>/s/Laurence M. Rosen</u>
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS